**The ASSOCIATION OF NATIONAL ADVERTISERS, INC., Grocery Manufacturers of America, Inc., the Soap and Detergent Association, National Food Processors Association, the American Paper Institute, Inc., the American Advertising Federation, the American Association of Advertising Agencies, the California Chamber of Commerce, and Chamber of Commerce of the United States, Plaintiffs,**

v.

**Daniel LUNGREN, in his official capacity as Attorney General of the State of California, Defendant.**

**No. C–92–0660 MHP.**

United States District Court, N.D. California.

Dec. 23, 1992.

John W. Keker, Susan J. Harriman, Keker & Brockett, San Francisco, CA, James M. Mattesich, Livingston & Mattesich, Sacramento, CA, for plaintiffs.

R. Cameron DeVore, Marshall J. Nelson, Debora K. Kristensen, Davis Wright Tremaine, Seattle, WA, for Media Institute, Inc.

Albert Norman Shelden, Susan E. Henrichsen, Deputy Attys. Gen., San Diego, CA, Christopher M. Ames, John G. Donhoff, Jr., Deputy Attys. Gen., San Francisco, CA, for defendant.

Maria Savasta Kennedy, Deborah S. Reames, Laurens H. Silver, Sierra Club Legal Defense Fund, San Francisco, CA, for Californians Against Waste and Environmental Defense Fund, defendant intervenors.

## OPINION

PATEL, District Judge.

Plaintiffs, The Association of National Advertisers, et al., bring this action against defendant Daniel Lungren, in his official capacity as Attorney General of the State of California.[1] Plaintiffs challenge section 17508.5 of the California Business and Professions Code, which regulates certain environmental claims used in advertising, on the grounds that: (1) the statute violates plaintiffs' First Amendment rights, and (2) it is unconstitutionally vague. The matter is presently before the court on plaintiffs' motion for summary judgement. After carefully considering the submissions and arguments of the parties and the amici,[2] the court enters the following Order and Opinion.

## I. BACKGROUND

In March 1990 a ten state task force of Attorneys General conducted public hearings to discuss the problems generated by the use of potentially misleading environmental advertising claims. Based on the testimony and written submissions of representatives from industry, consumer and environmental groups, the task force found:

> "Green marketing" has become the marketing craze of the 1990's. The American public is increasingly concerned about environmental issues, and people

---

1. Pursuant to rule 24(a) of the Federal Rules of Civil Procedure, this court previously granted defendant-intervenor status to Californians Against Waste and the Environmental Defense Fund.

2. The Media Institute filed a brief of amicus curiae in support of plaintiffs and the States of Minnesota, Tennessee, Massachusetts and Washington (collectively) submitted a brief of amicus curiae in support of the State of California.

are looking for ways to do their part to protect and restore our nation's resources. As consumers have become more aware of the environmental impacts of the products they purchase, environmental awareness has begun to influence purchasing decisions.

The increasing interest in the environmental consequences of purchasing decisions has not been lost on the business community.... Many companies have begun claiming that their products provide some benefit to the environment.... This marketing strategy, which has become known as "green marketing," can be informative to conscientious consumers when it is used honestly. Unfortunately, attempts to take advantage of consumer interest in the environment have led to a growing number of environmental claims that are trivial, confusing or even misleading.

Joint Stipulation ("JS"), Ex. 10 at 1. Specifically, the task force noted that in response to the growing consumer desire to purchase "environmentally safe" products, businesses advertised hundreds of products as "degradable," "recyclable," "recycled," and "ozone friendly." *Id.* at 5.[3]

California has also experienced an increase in the amount of environmental product advertising in the years prior to the enactment of section 17508.5. JS ¶ 49. Moreover, the terms employed in these advertisements are used differently by advertisers when claims are made about a product's environmental attributes. JS ¶ 23. In other words, not all firms mean the same thing when they label their products "ozone friendly," "recyclable," or the like. As the Attorneys General explained:

Both environmental groups and business representatives noted the growing confusion surrounding many environmental marketing claims and stated their belief that such confusion was fertile ground for abusive advertising practices.... [T]he words commonly used in environmental marketing, such as "environmentally friendly," "degradable," "recyclable," and "ozone friendly" have no clear, uniform meaning. Different manufacturers use the terms to promote different environmental benefits.

JS, Ex. 10 at 13.[4]

It was in this climate that the California Legislature in September 1990 passed AB 3994, the Environmental Advertising Claims Act which, *inter alia*, added section 17508.5 to the California Business and Professions Code ("section 17508.5"). The statute, entitled "Environmental Representations Relating to Consumer Goods," provides that:

It is unlawful for any person to represent that any consumer good which it manufacturers or distributes is "ozone friendly," or any like term which connotes that stratospheric ozone is not being depleted, "biodegradable," "photodegradable," "recyclable," or "recycled" unless that consumer good meets the definitions contained in this section, or meets definitions established in trade rules adopted by the Federal Trade Commission.

Cal.Bus. & Prof. Code § 17508.5.[5]

The sole issue before this court is whether the California legislature, in its effort to regulate the "green marketing" phenomenon, has run afoul of the Constitution.

---

**3.** According to the task force, products making environmental claims constituted over 9 percent of all new products introduced in the United States in the first half of 1990, a twenty-fold increase since 1985. JS, Ex. 10 at 5 n. 3.

**4.** As a result of their findings, the task force recommended that uniform definitions be established to govern environmental marketing claims. After issuing its report, the Attorneys General held a second set of hearings to obtain comments on their findings and recommendations. Plaintiff The American Paper Institute,

Inc. ("API") concurred with the task force's recommendation, testifying that they too saw the need for definitions to provide meaning to environmental marketing claims: "API believes that some form of standardized definitions and guidelines should be developed to provide meaning to environmental terms used in product advertising and labeling." JS, Ex. 9 at 1.

**5.** The entire text of section 17508.5 is set forth in the Appendix to this opinion.

## II. LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, .630 (9th Cir. 1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, the inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

If the court is satisfied that no genuine issue of material fact exists, and that absent any such issue judgment may be entered as a matter of law, the court may *sua sponte* grant summary judgment to the nonmoving party. *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311 (9th Cir.1982); *see also Celotex* 477 U.S. at 326, 106 S.Ct. at 2554 ("district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte* . . . .").

## III. DISCUSSION

### A. *The First Amendment*

1. What is the Character of the Speech at Issue?

▇ Initially the court must examine the character of the speech regulated by section 17508.5 in order to apply the appropriate standard for reviewing the statute. To the extent that the statute restricts noncommercial messages, it is subject to strict scrutiny and "may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co. v. Pub. Serv. Com.,* 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980) (citations omitted). Regulations affecting commercial speech, however, invite a more relaxed inquiry. *See Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 3033, 106 L.Ed.2d ·388 (1989) ("Our jurisprudence has emphasized that commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression.").

Plaintiffs contend that section 17508.5 sanctions *any use* of the regulated terms, thereby restricting their noncommercial expression. On this reading of the statute, plaintiffs complain that they are unable to express their policy views or publish editorial or informational advertisements aimed at inducing public activism.

The plain meaning of section 17508.5, however, supports no such interpretation. The first sentence of section 17508.5 clearly establishes that the law applies only to manufacturers and distributors of consumer goods who make certain representations about their products: "It is unlawful for any person *to represent that any consumer good which it manufactures or distributes* is . . . ." Cal.Bus. & Prof.Code § 17508.5 (emphasis added). Any uncertainty as to the statute's reach is mitigated by subsection (g) which provides that "a wholesaler or retailer who does not initiate a representation by advertising or by placing the representation on a package shall not be deemed to have made the representation." *Id.* § 17508.5(g). Finally, that the statute only pertains to product advertising is gleaned from the fact that the legislature placed section 17508.5 in Part 3, Chapter 1, Article 1 of the Business and Professions Code, which is entitled "False Advertising in General."

In an effort to paint section 17508.5 as a law that restricts noncommercial speech, plaintiffs offer numerous examples of the

types of political messages which are allegedly stifled.[6] However, since the statute only applies to representations that a specific consumer good possesses a particular environmental attribute, plaintiffs' examples are all unavailing. Educational advertisements which laud the benefits of tin cans in general are not representations concerning the environmental attributes of a particular consumer good, and therefore do not offend the statute. Similarly, informational advertisements that contain generalized expressions of an environmental attribute are not within the statute's ambit. Finally, a firm's statement that it supports recycling is certainly not a representation concerning a consumer good.

◼ In a further attempt to hoist the level of scrutiny, plaintiffs argue that their commercial advertisements are inseparable from their policy oriented speech designed to educate consumers on current environmental issues. This argument relies on *Riley v. Nat'l Fed'n of the Blind of N.C.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) which held that when commercial speech is "inextricably intertwined" with fully protected speech, courts must apply the test for noncommercial speech. *Id.* at 796, 108 S.Ct. at 2677. *Riley* involved a state law which mandated that professional fundraisers disclose to potential donors the percentage of contributions that are actually turned over to the charitable organization. In rejecting the state's

contention that deferential commercial speech scrutiny should apply because the mandatory disclosure law only governed commercial transactions, the Court explained that "[o]ur lodestars in deciding what level of scrutiny to apply to a *compelled statement* must be the nature of the speech taken as a whole and the effect of the *compelled statement* thereon." *Id.* (emphasis added). For this reason, the Court subjected the law to exacting First Amendment scrutiny.

The Court's reasoning in *Riley* has no purchase on the instant case for the simple reason that section 17508.5 does not compel speech; it merely sets forth statutory definitions for common environmental advertising terms. Moreover, the Supreme Court has explicitly rejected a similar attempt to extend the reach of *Riley's* holding. In *Fox* the Court reviewed whether a University Resolution which prohibited "tupperware parties" in student dormitories violated the First Amendment. The plaintiff argued that because their demonstrations also touched on subjects such as financial responsibility and how to run an efficient home, pure speech and commercial speech were "inextricably intertwined" and the entirety should be treated as noncommercial speech. The Court, per Justice Scalia, disagreed:

> *Riley* involved ... compelled commercial speech.... There, of course, the commercial speech (if it was that) *was* "inex-

6. Such examples include the following:

Del Monte supports steel can recycling. For information about recycling in your area, please contact the Steel Can Recycling Institute, 600 Anderson Drive, Pittsburgh, PA 15220.

This watch is a piece of junk. Its metal bearings are made entirely from recycled cans. In fact, the everyday "tin" can is made of 100% recyclable high grade steel. And if we all recycle, cans will provide the best means to build our bridges, skyscrapers, automobiles—even precision watches. The time to recycle is now.

Imagine this. A child is running down the dock at a marina to join his father for a summer sail in the family boat. Suddenly, his foot slips out of its sandal, and his bare foot scrapes across the wide planks. There are no screams of pain, no frenzied dash for the first-aid kit. Because in addition to being

impervious to water, insects and weather, the dock is splinterless. It's not made of wood, it's made from recycled plastics.

In another part of the country, a young couple moves into their first home. Workmen have just installed the new wall-to-wall carpet, which has rich, vibrant colors and soft, plush pile. The new high-quality carpet is made from recycled plastics.

On a snowy mountain, a skier emerges from the base lodge, wrapped snugly in a warm parka and bib-front pants. The insulating fiberfill in these outer garments is made of recycled plastics.

Sounds like science fiction? Or an optimistic projection for the year 2010? It's not. These are simply individual examples selected from the myriad of consumer and commercial products that are already being made from recycled plastics.

tricably intertwined" because the state law *required* it to be included. By contrast, there is nothing whatever "inextricable" about the noncommercial aspects of these presentations. No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the Resolution prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.

*Fox,* 492 U.S. at 473–76, 109 S.Ct. at 3031–32 (emphasis in original).

Like the Resolution upheld in *Fox,* section 17508.5 does not require that plaintiffs combine commercial and noncommercial speech in their advertisements. The noncommercial elements contained in plaintiffs' editorial and informational advertisements are not absolutely necessary to sell the product at issue. While statements that a firm supports recycling, for instance, are undoubtedly included in advertisements as a marketing tool and may in fact augment sales, firms can nevertheless sell their wares without editorializing about the environment. Thus, since the advertising contemplated by section 17508.5 unquestionably proposes a commercial transaction, and since the commercial and noncommercial messages are not "inextricably linked" under *Fox,* section 17508.5 applies only to commercial speech.

The court's holding in this regard is supported by the great weight of decisional law. In *Central Hudson Gas v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) the Court applied commercial speech principles in reviewing a Public Utility Commission's order banning all advertising that promoted the use of electricity. Concurring with the Court's result but not its reasoning, Justice Stevens argued that because the promotional advertising in question included claims "relating to ... questions frequently discussed and debated by our political leaders," it should be afforded full First Amendment protection. *Id.* at 581, 100

S.Ct. at 2359 (Stevens, J., concurring). The majority disagreed, noting that under Justice Steven's approach, any advertisement which linked a product to a current public debate would perforce be entitled to broad constitutional protection:

> But many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety.... [U]tilities enjoy the full panoply of First Amendment protections for their direct comments on public issues. There is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions.

*Id.* at 562 n. 5, 100 S.Ct. at 2349 n. 5.

The Court affirmed this logic in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) by deciding that advertisements for contraceptives constituted commercial speech, "notwithstanding the fact that they contain discussions of important public issues such as the prevention of venereal disease and family planning." *Id.* at 67–68, 103 S.Ct. at 2352. The *Bolger* court explained that like the Public Utility in *Central Hudson,* contraceptive manufacturers enjoy the full panoply of First Amendment protection whenever they express themselves directly on contemporary public issues. Furthermore, "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id.* at 68, 103 S.Ct. at 2852; *see also Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 637 n. 7, 105 S.Ct. 2265, 2274 n. 7, 85 L.Ed.2d 652 (1985) (attorney's advertisement containing statements regarding the legal rights of persons injured by the Dalkon Shield treated as commercial speech.)

In the case at bar plaintiffs also attempt to immunize their commercial speech from state regulation by insisting that editorial or informational statements concerning current environmental policy transform their advertisements into speech deserving greater constitutional protection. The Su-

preme Court's reasoning in *Central Hudson* and *Bolger* counsels to the contrary. Like the regulations at issue in those cases, section 17508.5 places no general restrictions on plaintiffs' right to comment directly on current environmental policy. Plaintiffs are free to encourage recycling, or to editorialize about the environmental benefits of biodegradable plastics, or to comment on the desirability of ozone friendly products. The statute under review does not restrict the types of expression normally afforded "the full panoply" of constitutional protection.

Finally, the messages regulated by section 17508.5 possess the three characteristics recognized by the Court as constitutive of commercial speech. In *Bolger* the Court classified the informational advertisements under review as commercial speech because: (1) they were in the form of an advertisement, (2) they referred to a specific product, and (3) there was an economic motive behind the speech. 463 U.S. at 66–67, 103 S.Ct. at 2880–81. Though alone, none of these factors might be sufficient to turn the materials into commercial speech, the "combination of all these characteristics [compels] the conclusion that the informational pamphlets are properly characterized as commercial speech." *Id.* at 67, 103 S.Ct. at 2880.

First, by its explicit terms, the statute regulates representations concerning a specific consumer good which take the form of advertisements or product labels. Second, section 17508.5 specifically requires that the representation be made about a specific consumer good which a firm manufactures or distributes. Third, there is little doubt that by touting the environmental benefits of consumer products, plaintiffs' association members hope to capture a portion of the "green market." As plaintiffs concede, California consumers "buy products based on their asserted environmental attributes." JS ¶ 48. Despite the fact that educating consumers about the environmental attributes of consumer products may well enhance environmental quality, *see e.g.*, JS ¶ 17, the primary motivation of such advertising is economic, namely, to sell products.

Although drawing the line between "purely commercial ventures and protected distribution of written materials [is] a difficult task," *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 630, 100 S.Ct. 826, 832, 63 L.Ed.2d 73 (1980), First Amendment jurisprudence recognizes "the common-sense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978). For the reasons set forth above, the court concludes that the regulated speech in this case is entitled to the qualified protection accorded commercial speech.

2. Is Section 17508.5 a Permissible Restriction on Commercial Speech?

Having determined that section 17508.5 regulates commercial speech, the court must now determine whether the statute passes muster under the more relaxed commercial speech standards. In *Central Hudson* the Court outlined a four part inquiry for analyzing the lawfulness of restrictions on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. at 2351.

As for the first step of the *Central Hudson* analysis, the Court has explained that whatever concern the First Amendment has for protecting commercial speech is rooted in the informational function of advertising. Therefore, the Constitution does not prevent prohibitions on commercial messages which are "more likely to deceive

the public than to inform it." *Id.* at 563, 100 S.Ct. at 2350 (citation omitted). *But see Peel v. Attorney Reg. & Disciplinary Com'n,* 496 U.S. 91, 108, 110 S.Ct. 2281, 2292, 110 L.Ed.2d 83 (1990) (categorical ban on factually accurate commercial speech that may be potentially misleading to some consumers is constitutionally infirm). Whether the terms defined in section 17508.5—ozone friendly, biodegradable, photodegradable, recyclable, and recycled—are sufficiently deceptive to place the statute beyond the reach of any First Amendment protection is a question to which, frankly, this court finds no easy answer.[7]

Arguably, there is ample evidence that advertisements which extol a product's environmental benefits are potentially deceptive. In urging California Governor Deukmejian to sign AB 3994, the Attorney General's office opined:

> In recent years we have seen an increase in questionable "environmental" advertising with claims such as "environmentally friendly," "biodegradable," and "recyclable" being utilized with virtually no scientific support.... Environmental claims are similar to the "health" claims made for elixirs in the Old West. There was no scientific or medical basis for the claims, but there was also no basis for disproving them! Thus, the claims were made, and consumers relied upon those claims in making product choices without knowing of the total absence of credible evidence to support the claims.

JS, Ex. 25. The author of the legislation, Assembly member Byron Sher, cited several examples to highlight the deceptive nature of environmental advertising claims. *See* JS, Ex. 26 (Letter from Assembly member Sher to Governor Deukmejian). For instance, one manufacturer labelled its plastic bag as being "recyclable." In reality, the product was only recyclable if the consumer returned it to the manufacturer's plant in South Carolina. In another example, disposable diapers were labelled "biodegradable" when in truth, the plastics contained in the product would biodegrade only after hundreds of years, and then only in ideal conditions. *Id.*[8]

These examples might suggest that to control the problem of potentially deceptive advertising a legislative body should be allowed great deference in deciding whether marketing claims are misleading. *Cf. National Com'n on Egg Nutrition v. F.T.C.,* 570 F.2d 157, 161 (7th Cir.1977) (agency determination on misleading nature of advertisement subject only to "substantial evidence" review). However, First Amendment analysis of commercial messages begins "with the content of the message and not the label given the message under the relevant statute." *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.,* 943 F.2d 644, 651 n. 9 (6th Cir.1991) (citation omitted); *see also Peel,* 496 U.S. at 106–109, 110 S.Ct. at 2291–2292 ("Whether the inherent character of a statement places it beyond the protection of the First Amendment is a question of law over which Members of this Court should exercise *de novo* review.").

---

**7.** Even the parties defending the constitutionality of section 17508.5 do not agree on this issue. For the purposes of the first part of the *Central Hudson* inquiry, defendants assume that the terms defined in section 17508.5 are not misleading and urge the court to focus its inquiry on the last three prongs of the *Central Hudson* test. *See* Def.Opp. at 42. Defendant–Intervenors, on the other hand, posit that the commercial speech in question is inherently misleading and is therefore not protected by the First Amendment at all. *See* Def.Int.Opp. at 26–29.

**8.** Plaintiffs themselves recognize that the terms regulated by section 17508.5 are potentially misleading. The National Food Processors Association, the Association of National Advertisers, Inc., the Grocery Manufacturers of America, Inc. and the American Association of Advertising Agencies petitioned the Federal Trade Commission to adopt guidelines to govern environmental advertising claims. *See* JS, Ex. 13. They acknowledged that "[a]t a time when environmental concerns have reached new heights, there is a great risk of deceptive practices." *Id.* at 4. Similarly, the American Paper Institute testified before the F.T.C. urging the agency to bring uniformity to environmental advertising claims because "[t]here is considerable confusion as to the appropriate content and context of such claims." JS, Ex. 14 at 2.

■ It is the role of this court to exercise its independent judgment and determine whether the commercial messages in question warrant any First Amendment protection. If First Amendment scrutiny in the commercial speech arena is to have any bite at all, a legislative body cannot justify its restrictions on commercial speech simply by declaring that marketing claims are misleading. *See Puerto Rico Tele–Com, Inc. v. Ocasio Rodriguez*, 747 F.Supp. 836, 843 (D.Puerto Rico 1990) ("Wooden deference to a state's determination as to the misleading nature of an advertisement would obviously place in jeopardy some commercial speech that is in fact not misleading and thus deserving of at least limited First Amendment protection."). For this reason, the court cannot say that due to their allegedly misleading nature, the commercial messages at issue are not protected by the First Amendment at all.[9] However, the environmental advertisements in question are at least potentially misleading to the public and therefore some form of regulation is justified. Whether the regulation embodied in section 17508.5 survives First Amendment scrutiny is answered by considering the remaining elements of the *Central Hudson* test.

The second part of the *Central Hudson* inquiry requires no discussion for the parties agree that California's governmental interest in ensuring truthful environmental advertising and encouraging recycling and environmentally sound packaging is substantial.

The third prong of the *Central Hudson* test provides that regulations on commercial speech "directly advance" the governmental interest at stake. If a restriction provides only "ineffective or remote support" for the government's asserted policy goal, it fails under the First Amendment. 447 U.S. at 564, 100 S.Ct. at 2350. Likewise, "conditional and remote eventualities simply cannot justify silencing ... promotional advertising." *Id.* at 569, 100 S.Ct. at 2353. The *Central Hudson* Court held that because there was an "immediate connection" between advertising and consumer demand for electricity, the government's interest in energy conversation was directly advanced by Public Utility Commission's order banning promotional advertising by electrical utilities. *Id.*

To reduce deceptive environmental advertising, section 17508.5 requires that when used by manufacturers or distributors of consumer goods in advertising or labels, the terms "ozone friendly," "photodegradable," "biodegradable," "recyclable," and "recycled" must meet the statutory definitions contained therein. The statute is premised on the belief that consumers have difficulty determining the veracity of the environmental claims advertisers make concerning consumer products. Given the confusion over what advertisers mean when they state, for example, that a product is recyclable or biodegradable, the legislature sought to level the playing field for all advertisers by requiring that they mean the same thing when using the terms set forth in the statute. As in *Central*

9. Defendant–Intervenors' reliance on *Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1978) to support their claim that the deceptive advertising addressed by section 17508.5 falls outside the orbit of First Amendment protection is misplaced. In *Friedman* the Court upheld a complete ban on the use of trade names in optometrists' advertisements because of the numerous possibilities for deception. The Court emphasized, however, that trade names have no intrinsic meaning and convey no information whatsoever about the nature of the services offered by an optometrist. *Id.* at 12, 99 S.Ct. at 895. Moreover, the Court qualified its holding by explaining that restricting the use of trade names "has only the most incidental effect on the content of the commercial speech of ... optometrists." *Id.*

By the same token, plaintiffs' reliance on *Peel* is misplaced. The *Peel* Court held that the potentially misleading nature of an attorney's statement on his letterhead that he was a "Certified Civil Trial Specialist" did not justify a "categorical ban" on such statements. 496 U.S. at 108, 110 S.Ct. at 2292. But the Court explained that less restrictive regulations of commercial speech would be permissible: "to the extent that potentially misleading statements of private certification of specialization could confuse consumers, a State might consider screening certifying organizations, or requiring a disclaimer about the certifying organization or the standards of a specialty." *Id.*

*Hudson* there is an immediate connection in this case between environmental advertising and sales. Section 17508.5 governs how manufacturers and distributors advertise the environmental attributes of their products and thereby decreases the chance that consumers will be misled by the use of undefined environmental terms.[10] For these reasons, the link between the uniform definitions mandated by section 17508.5 and the goal of ensuring that consumers understand the claimed environmental attributes of products is neither "tenuous" nor "speculative." *See Central Hudson*, 447 U.S. at 569, 100 S.Ct. at 2353.

In *Posadas v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) the Court explained that "[t]he last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Id.* at 341, 106 S.Ct. at 2976. In *Fox* the Court clarified that the requisite fit need not be perfect, but simply reasonable. 492 U.S. at 480, 109 S.Ct. at 3035; *see also Metromedia, Inc. v. San Diego*, 453 U.S. 490, 509, 101 S.Ct. 2882, 2893, 69 L.Ed.2d 800 (1981) (plurality opinion) (third prong of *Central Hudson* test satisfied where legislative judgment is not "manifestly unreasonable"). In holding that Puerto Rico's ban on advertising casino gambling directly advanced the government's interest in reducing the demand for gambling, the *Posadas* Court looked no further than the reasonableness of the legislature's belief that advertising casino gambling increases the demand for gambling. 478 U.S. at 342, 106 S.Ct. at 2977. Similarly, the California legislature's belief

that uniform standards for frequently used environmental advertising terms would promote the state's consumer protection goals, is clearly reasonable. Thus, the court finds that the statute under review directly advances the asserted governmental interest.[11]

Under the fourth prong of the *Central Hudson* framework, a restriction on commercial speech must be "no more extensive than necessary to further the state's interest." 447 U.S. at 569–70, 100 S.Ct. at 2353–54. Plaintiffs contend that because section 17508.5 prevents them from accurately describing their products' environmental attributes when such disclosures deviate from the statutory definitions, the statute fails to meet that standard.

If the last element of the *Central Hudson* test were interpreted strictly, as a "least-restrictive-means test," plaintiffs' reasoning might be persuasive. However, that construction was rejected in *Fox* where Justice Scalia explained that *Central Hudson* "requires something short of a least-restrictive-means standard." 492 U.S. at 477, 109 S.Ct. at 3033. While acknowledging that past Supreme Court cases could be read to mean that restrictions on commercial speech are invalid if the governmental interest could be served as well by a more limited restriction, Justice Scalia announced that such a standard "would be incompatible with the ... subordinate position of commercial speech in the scale of First Amendment values." *Id.* at 477, 109 S.Ct. at 3034. The Court held that the fourth prong of the *Central Hudson* test imposes upon government the burden of establishing that a reasonable fit exists

---

**10.** The ten state task force of Attorneys General came to the same conclusion: "Uniform definitions are needed ... to ensure that marketers know what properties their products must possess before they can make these claims and to ensure that consumers get the accurate information they need to make informed purchasing decisions based on environmental considerations." JS, Ex. 3 at 1.

**11.** Plaintiffs find great solace in *Lever Bros. Co. v. Maurer*, 712 F.Supp. 645 (S.D.Ohio 1989) where the court found that prohibiting use of the word "butter" on labels and advertisements except for products that were 100 percent butter

did not directly advance the government's interest in protecting its citizens from misleading information regarding food products when applied to a firm that sought to accurately advertise its dairy spread as containing 50 percent butter. *Id.* at 652. Plaintiffs argue that as with the word butter in *Maurer*, there is nothing inherently misleading about the terms covered by section 17508.5. The court disagrees. Unlike the word butter, terms like "ozone friendly," "photodegradable" and the like are not frequently used words enjoying a commonly agreed upon definition.

between the government's interest and the means chosen to advance that interest. A government meets its burden by demonstrating that a commercial speech regulation is "not necessarily the least restrictive means but, ... a means narrowly tailored to achieve the desired objective." *Id.* at 480, 109 S.Ct. at 3035. "By declining to impose, in addition, a least-restrictive-means requirement, we take account of the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires, and provide the legislative and executive branches needed leeway in a field (commercial speech) 'traditionally subject to governmental regulation.'" *Id.* (citation omitted).

Plaintiffs correctly point out that the restrictions on commercial speech imposed by section 17508.5 prohibit the use of the terms in question when they don't meet the statutory definitions, even if qualifying or explanatory language is included to clarify how the term is being used.[12] For example, to make a claim that a product is recyclable, the statute provides that it must be "conveniently recycled ... in every county in California with a population over 300,000 persons." Cal.Bus. & Prof.Code § 17508.5(d). Therefore, the statement that "this milk carton is recyclable in San Diego County" might violate the statute even if it is completely accurate. However, the fact that plaintiffs are prevented from making an accurate claim of this nature does not render section 17508.5 constitutionally infirm. Since the state has a substantial interest in encouraging recycling and reducing solid waste, it was reasonable for the legislature to require that a product can be advertised as "recyclable" only if it is recyclable in the 21 California counties with populations exceeding 300,000 people. Similarly, the truthful claim that a product is "recyclable where facilities exist" may imply to consumers that the product is recyclable in their local program even

though that might not be the case. Such a claim, though factually correct, could be misleading and fail to advance the goal of encouraging recycling.

The same reasoning applies to claims regarding biodegradability. The statute requires that to tout a product as being biodegradable, it must "decompose in the most common environment where the material is disposed within one year through natural biological processes into nontoxic carbonaceous soil, water, or carbon dioxide." Cal.Bus. & Prof.Code § 17508.5(b). The claim that a product is "biodegradable, if composted" might be truthful, but if the product is only disposed in landfills, the alleged environmental attribute actually produces no benefit.

For these reasons, plaintiffs have not convinced the court that section 17508.5 is "substantially excessive, disregarding far less restrictive and more precise means." *Fox,* 492 U.S. at 479, 109 S.Ct. at 3034. The California legislature decided that allowing manufacturers and distributors to evade the dictates of section 17508.5 by defining the terms themselves would not promote the state's consumer and environmental protection goals. Because such a policy determination is reasonable in light of *Fox,* "we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Id.* at 480, 109 S.Ct. at 3035.

In a final attempt to show that section 17508.5 violates the fourth prong of the *Central Hudson* test, plaintiffs present "less restrictive" alternatives which the California legislature could have adopted to regulate environmental advertising. For example, state officials could enforce with more vigor sections 17500 and 17508 of the Business and Professional Code, which contain general prohibitions on false advertising. This argument clearly fails, for nothing prevents a legislative body from adopting a specific law simply because a more

12. The Attorney General responds to plaintiffs' argument by urging the court to narrowly interpret section 17508.5 as only applying when the terms in question are used without qualifying or explanatory language. Whether it would be proper for this court to adopt such a narrowing

construction on a state statute which by its terms makes no such distinction, need not be resolved. Even without a narrowing construction, the statute is sufficiently tailored to promote its objective.

general law already exists. Plaintiffs also suggest that to cure the potential for deceptive advertising, the legislature could have required that manufacturers and distributors use disclaimers or other qualifying language where necessary. As shown above, there is a substantial likelihood that qualifying language would not further the state's interests. In addition, the Supreme Court has specifically rejected the notion that the court should second guess a legislative decision to restrict speech rather than to require more speech. *See Posadas,* 478 U.S. at 344, 106 S.Ct. at 2978 (it was up to the legislature to decide that the goal of deterring casino gambling was better served by suppressing commercial speech that encourages gambling than by compelling speech designed to discourage it). Finally, this court should not query whether *any* less restrictive measures exist to accomplish the asserted goals. The *Fox* Court, in reciting its previous upholding of a complete ban on off-site billboard advertising, stated: "we did not inquire whether *any* less restrictive measure (for example, controlling the size and appearance of the signs) would suffice to meet the city's concerns for traffic safety and esthetics." 492 U.S. at 479, 109 S.Ct. at 3034 (citing *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 513, 101 S.Ct. 2882, 2895, 69 L.Ed.2d 800 (1981)).

When the *Central Hudson* Court struck down a regulation banning all advertising by an electrical utility, the Court suggested several alternatives which it considered "no more extensive than necessary" to advance the goal of promoting energy conservation. These options included prescreening advertisements to insure that they were not at odds with the government's conservation policy, restricting the format and content of the advertising, and compelling disclosures about the efficiency of the services offered. 447 U.S. at 571 & n. 13, 100 S.Ct. at 2354 & n. 13. The fact that these "limited regulations" of commercial speech are all as, if not more, restrictive than the uniform definitions provided by section 17508.5 confirms that the California legislature has stayed within constitutional parameters in restricting commercial expression.

B. *Vagueness*

In its effort to regulate the "green marketing" phenomenon, plaintiffs contend that the California Legislature drafted an unconstitutionally vague statute. Section 17508.5(a) provides that "ozone friendly, *or any like term* which connotes that stratospheric ozone is not being depleted, means that...." Cal.Bus. & Prof.Code § 17508.-5(a). Section 17508.5(d) states that "recyclable means that an article can be *conveniently recycled* ... in every county in California with a population over 300,000 persons." *Id.* § 17508.5(d). It is the ambiguity of these two phrases which allegedly pose constitutional problems.

The threshold question is what vagueness standard governs a proscription on commercial speech. Ordinarily, principles of due process dictate that a criminal statute provide "adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley v. Valeo,* 424 U.S. 1, 77, 96 S.Ct. 612, 662, 46 L.Ed.2d 659 (1976) (citations omitted). Furthermore, when a law regulates conduct protected by the First Amendment, the vagueness doctrine demands an even "greater degree of specificity than in other contexts." *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974) (footnote omitted).

Although the vagueness doctrine has never drawn a distinction between commercial and noncommercial speech, given the lesser constitutional protection accorded commercial speech, there may be little justification for applying the exacting vagueness test which obtains when a law infringes upon fundamental interests protected by the First and Fourteenth Amendments. *Cf. Friedman v. Rogers,* 440 U.S. 1, 12, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1979) ("when dealing with restrictions on commercial speech we frame our decisions narrowly, allowing modes of regulation

that might otherwise be impermissible in the realm of noncommercial expression.").

As the Court noted in *Central Hudson*, there are at least two distinguishing features of commercial speech which allow for greater restrictions upon its content. First, because commercial speakers know the market and their product, they are uniquely positioned to assess the accuracy of their advertising claims and the lawfulness of their activity. Second, commercial speech springs solely from economic self-interest and is thus a resilient form of expression not vulnerable to being silenced by imprecise regulation. 447 U.S. at 564 n. 6, 100 S.Ct. at 2350 n. 6; *see also id.* at 571 n. 13, 100 S.Ct. at 2354 n. 13 (commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply, and system of previewing advertising campaigns may be acceptable given adequate procedural safeguards); *Zauderer*, 471 U.S. at 668, 105 S.Ct. at 2290 (Brennan, J., concurring in part and dissenting in part) (a basic justification for allowing punishment for violations of imprecise commercial regulations is that businesspersons can clarify the meaning of arguably vague regulations by consulting with governmental administrators).

For these reasons, the overbreadth doctrine has been found not to apply in the commercial speech context. *See, e.g., Bates v. State Bar of Arizona*, 433 U.S. 350, 381, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977) (although overbroad statutes may "chill protected speech," advertising is "linked to commercial well-being" and will therefore not be "crushed by overbroad regulation."). Of course, overbreadth is technically a standing doctrine which permits a party to challenge a law for impinging the First Amendment rights of others who are not before the court. Nonetheless, it is a close cousin to vagueness in that both doctrines recognize that imprecise statutes are of constitutional moment because they discourage people from exercising protected rights. *See Grayned v.*

*City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972) ("overbroad laws, like vague ones, deter privileged activity...."). *Bates* implies that although the vagueness doctrine may apply to commercial messages, a more relaxed inquiry may be appropriate.

In determining the vagueness standard for laws which do not reach any constitutionally protected conduct, the Court has explained:

> The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Village of Hoffman Est. v. Flipside, Hoffman Est.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (footnotes omitted). Although the ordinance at issue in *Village of Hoffman*, unlike section 17508.5, was a business licensing provision which implicated no commercial speech rights at all, the case does represent an implicit determination by the Supreme Court that in the commercial speech context, a statute need not rise to the level of precision required in noncommercial speech cases.

The relaxed vagueness test articulated in *Village of Hoffman*, although instructive, is not wholly controlling. The ordinance at issue in *Village of Hoffman* was punishable by fines of $10 to $500. Violation of section 17508.5, on the other hand, is a misdemeanor punishable by imprisonment of up to six months and/or a fine not exceeding $1,000. Cal.Pen.Code § 19 (West 1988).[13] It goes without saying that

---

**13.** California law provides other penalties for violations of section 17508.5, including civil injunction and civil fines not exceeding $2,500.

*See* Cal.Bus. & Prof.Code §§ 17535 & 17536 (West 1991).

the standard of certainty required in criminal statutes is more demanding than in noncriminal statutes because the consequences of imprecision are more onerous. *Village of Hoffman*, 455 U.S. at 498, 102 S.Ct. at 1193 (citing *Winters v. People of State of New York*, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948)). It would be unthinkable to incarcerate someone for violating a law which she could not possibly understand. *Barenblatt v. United States*, 360 U.S. 109, 137, 79 S.Ct. 1081, 1098, 3 L.Ed.2d 1115 (1959) (Black, J., dissenting).[14]

■ In light of all this, the court finds that in reviewing a commercial speech prohibition for facial vagueness which imposes criminal sanctions the question is whether the law affords fair notice to a businessperson of ordinary intelligence as to what conduct is illegal. The court now considers the challenged portions of section 17508.5.

■ The definition for "ozone friendly" is comprehensible on its face. The phrase "or any like term" is not ambiguous; it clearly refers to the modifying phrase "which connotes that stratospheric ozone is not being depleted." Cal.Bus. & Prof.Code § 17508.5(a). Section 17508.5(a) plainly brings within its scope only those advertising claims which suggest that the product does not deplete stratospheric ozone. The court is confident that manufacturers and distributors of ordinary intelligence know whether their product—through its use or production—releases any chemical or material into the environment which will "migrate to the stratosphere and cause unnatural and accelerated deterioration of ozone." *Id.*[15]

■ The statute's definition of "recyclable" is more uncertain. The problem is that while section 17508.5(d) defines a consumer good as "recyclable" if it can be "conveniently recycled" in California counties with more than 300,000 people, the statute offers no guidance as to what recycling programs satisfy the "conveniently recycled" requirement. Section 17508.5(d) refers to section 40180 of the Public Resources Code which unambiguously defines "recycled."[16] However, an equally lucid explication of "conveniently" is wanting. Nor is there any legislative history extant to provide the court with guidance.[17]

Does a manufacturer or distributor incur criminal penalties for labeling a product as "recyclable" if the recycling center which handles such products is located in a remote part of the county, or, if it is only open one day a month? This may be a fanciful example, but in light of the legislature's failure to define "conveniently," "[w]here does fanciful possibility end and intended coverage begin?" *Baggett v. Bul-*

---

**14.** In an attempt to skirt the criminal nature of section 17508.5, the state argues that according to "traditional office policy," violations of the statute are always filed civilly, not criminally. This will not do, for "well intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law." *Baggett v. Bullitt*, 377 U.S. 360, 373, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964).

**15.** Any uncertainty as to the "like terms" contemplated by section 17508.5(a) is settled by Federal Trade Commission Guidelines which explain that ozone depleting materials include those substances listed as Class I and Class II chemicals in Title VI of the Clean Air Act, Amendments of 1990, Pub.L. No. 101–549, or others subsequently designated by the Environmental Protection Agency as ozone-depleting substances. Class I chemicals are chlorofluorocarbons (CFCs), halons, carbon tetrachloride and 1,1,1–trichloroethane. Class II chemicals are hydrochlorofluorocarbons (HCFCs). *See* Def.Opp., Ex. A at 26–27.

**16.** Section 40180 of the Public Resources Code provides:
"Recycle" or "recycling" means the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw materials for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace. Cal.Pub.Res.Code, § 40180 (West 1992).

**17.** At oral argument the Deputy Attorney General muddied the waters further by suggesting that "conveniently" may refer both to the technological ease with which a container can be recycled and the access consumers must have to recycling centers which accept the materials in question. Moreover, the relevant state agency has not promulgated any regulations which define "conveniently recycled."

*litt,* 377 U.S. 360, 373, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964). Did the legislature mean to establish a requirement that a substantial majority of consumers must have access to recycling programs that collect the material in question? Or can a product can be labeled recyclable as long as at least one facility exists in the county to collect the relevant materials? That questions of this nature so readily come to mind means that it is not sufficiently clear to a manufacturer or distributor of ordinary intelligence, what exactly the statute prohibits. Due to the potential for criminal sanctions, including incarceration, the absence of any standard for "conveniently recycled" wrecks this portion of section 17508.5 on the shoals of vagueness. Although the legislature "needs leeway" to advance its goals in the commercial speech arena, *Fox,* 492 U.S. at 480, 109 S.Ct. at 3035, in this instance the constitutional requirement of definiteness has not been met.

■ It is an elementary principle of statutory construction that "the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985) (quoting *Allen v. Louisiana,* 103 U.S. 80, 83–84, 26 L.Ed. 318 (1881)). Under California law, the ability to sever an invalid portion of a statute depends on "whether the remainder is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute or constitutes a completely operative expression of the legislative intent and [is] not so connected with the rest of the statute as to be inseparable." *Metromedia, Inc. v. City of San Diego,* 32 Cal.3d 180, 190, 185 Cal.Rptr. 260, 649 P.2d 902 (1982) (citations omitted).[18]

There can be no dispute that the California Legislature would have passed AB 3994 had they known that the definition of "recyclable" was invalid. Furthermore, the remainder of section 17508.5 retains its effectiveness as a constitutionally permissible regulation on commercial speech. Accordingly, the court holds that subsection (d) of the statute is invalid, but leaves the remainder of section 17508.5 intact.

## IV.  CONCLUSION

The California legislature has responded to the "green marketing" phenomenon by mandating statutory definitions for commonly used environmental advertising claims. Plaintiffs have made this facial challenge on First Amendment and vagueness grounds. This court holds that section 17508.5 permissibly restricts plaintiffs' commercial speech and, except for subsection (d), the statute is not unconstitutionally vague on its face.

Accordingly, the court GRANTS partial summary judgment for plaintiff solely with respect to subsection (d) of section 17508.5 of the California Business and Professions Code which is stricken as unconstitutionally vague. In all other respects, plaintiffs' summary judgment motion is DENIED and the court, *sua sponte,* GRANTS partial summary judgment for defendant.

IT IS SO ORDERED.

## APPENDIX

### ENVIRONMENTAL REPRESENTATIONS RELATING TO CONSUMER GOODS

It is unlawful for any person to represent that any consumer good which it manufactures or distributes is "ozone friendly," or any like term which connotes that stratospheric ozone is not being depleted, "biodegradable," "photodegradable," "re-

---

**18.** This is essentially the same standard employed to determine the severability of federal statutes: "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo,* 424 U.S. 1, 108–109, 96 S.Ct. 612, 677–78, 46 L.Ed.2d 659 (1976) (quoting *Champlin Refining Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)).

cyclable," or "recycled" unless that consumer good meets the definitions contained in this section, or meets definitions established in trade rules adopted by the Federal Trade Commission. For the purposes of this section, the following words have the following meanings:

(a) "Ozone friendly," or any like term which connotes that stratospheric ozone is not being depleted, means that any chemical or material released into the environment as a result of the use or production of a product, will not migrate to the stratosphere and cause unnatural and accelerated deterioration of ozone.

(b) "Biodegradable" means that a material has the proven capability to decompose in the most common environment where the material is disposed within one year through natural biological processes into nontoxic carbonaceous soil, water, or carbon dioxide.

(c) "Photodegradable" means that a material has the proven capability to decompose in the most common environment where the material is disposed within one year through physical processes, such as exposure to heat and light, into nontoxic carbonaceous soil, water, or carbon dioxide.

(d) "Recyclable" means that an article can be conveniently recycled, as defined in Section 40180 of the Public Resources Code, in every county in California with a population over 300,000 persons. For the purposes of this subdivision, "conveniently recycled" shall not mean that a consumer good may be recycled in a convenience zone as defined in Section 14509.4 of the Public Resource Code.

(e) "Recycled" means that an article's contents contain at least 10 percent, by weight postconsumer material, as defined in subdivision (b) of Section 12200 of the Public Contract Code.

(f) "Consumer Good" means any article which is used or brought for use primarily for personal, family, or household purposes.

(g) For the purposes of this Section, a wholesaler or retailer who does not initiate a representation by advertising or by placing the representation on a package shall not be deemed to have made the representation.

Cal.Bus. & Prof.Code § 17508.5 (West 1991).