44 F.3d 726
 63 USLW 2348, 25 Envtl. L. Rep. 20,183,
22 Media L. Rep. 2513
 ASSOCIATION OF NATIONAL ADVERTISERS, INC.; Grocery
Manufacturers of America, Inc.; Soap and Detergent
Association; National Food Processors Association; The
Society of the Plastics Industry, Inc.; The American Paper
and Forest Association; The American Advertising
Federation; The American Association of Advertising
Agencies; The California Chamber of Commerce; and The
Chamber of Commerce of the United States, Plaintiffs-Appellants,
Californians Against Waste and The Environmental Defense
Fund, Intervenors-Appellees,
v.
Daniel E. LUNGREN, in his official capacity as Attorney
General of the State of California, Defendant-Appellee.
 No. 93-15644.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 13, 1994.
Decided Nov. 18, 1994.
 
 Floyd Abrams, Cahill Gordon and Reindel, New York City, for plaintiffs-appellants.
 Albert N. Shelden, Deputy Atty. Gen., San Diego, CA, for defendant-appellee.
 Barbara J. Olshansky, Environmental Defense Fund, New York City (with whom Maria Savasta Kennedy, Rosen, Bien & Asaro, San Francisco, CA, on brief), for intervenors-appellees.*
 Appeal from the United States District Court for the Northern District of California.
 Before: CHOY, NOONAN, Circuit Judges and MARQUEZ, District Judge.**
 Opinion by Judge CHOY; Dissent by Judge NOONAN.
 CHOY, Circuit Judge:
 
 
 1
 Appellants, the Association of National Advertisers, Inc., et al. (Trade Associations), appeal the district court's grant of summary judgment upholding the constitutionality of California Business and Professions Code Sec. 17508.5. Having jurisdiction under 28 U.S.C. Sec. 1291, we affirm.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Section 17508.5 makes it unlawful for a manufacturer or distributor of consumer goods to represent that its products are "ozone friendly", "biodegradable", "photodegradable", "recyclable" or "recycled" unless their goods meet the statute's definitions of those terms. See Appendix. In 1990, the California Legislature enacted this statute in the wake of a report on environmental advertising issued by a ten-state task force of state attorneys general (the Task Force). This report summarized the findings of the Task Force from a public meeting it convened in March 1990 to address the potential for abuse raised by the increasing popularity of what the attorneys general characterized as "[g]reen marketing ... the marketing craze of the 1990's."
 
 
 3
 The Task Force found disparities in the usage of these terms by different firms and noted the assertions of environmental groups and business representatives that there was "growing confusion surrounding many environmental marketing claims" creating a "fertile ground for abusive business practices." Ass'n of Nat'l Advertisers, Inc. v. Lungren, 809 F.Supp. 747, 750 (N.D.Cal.1992). The Task Force further discerned a "wide degree of consensus among business and environmental groups" on the need for "development of national standards, guidelines or definitions to guide business in making environmental claims and to help consumers understand the claims made." Section 17508.5 is an attempt to implement these findings at the state level.
 
 
 4
 In February 1992, the Trade Associations responded to the passage of section 17508.5 by bringing suit in the Northern District of California against the attorney general of California, Appellee Daniel Lungren (Lungren or California). The Trade Associations sought a declaration that section 17508.5 impermissibly restricts both commercial and non-commercial speech and is unconstitutionally vague. They also pursued a permanent injunction against the statute's enforcement. Appellees, the Californians Against Waste and the Environmental Defense Fund (collectively referred to as "CAW"), intervened.
 
 
 5
 The district court held that the statute was adequately tailored to further substantial state interests in consumer and environmental protection and, accordingly, complied with the First Amendment. The Trade Associations appeal this ruling here on the basis that (1) the district court erred in concluding that section 17508.5 regulates only commercial speech; (2) the district court erroneously analyzed the statute under an intermediate standard of scrutiny inapplicable to non-commercial speech, or to commercial speech inextricably intertwined with more privileged expression; and (3) the district court misapplied intermediate scrutiny by ignoring far less restrictive alternatives to section 17508.5 and mistakenly finding that the statute directly advances a substantial governmental interest.[1]
 
 II. DISCUSSION
 
 6
 A. Intermediate scrutiny governs section 17508.5.
 
 
 7
 The Trade Associations contend that the district court erred in holding that section 17508.5 regulates only commercial speech. They further assert that as a result the district court applied to the statute an unduly deferential standard of review, the intermediate scrutiny governing commercial speech. We disagree.
 
 
 8
 A district court's interpretation of a statute presents a question of law reviewed de novo. United States v. Freeman, 6 F.3d 586, 592 (9th Cir.1993).
 
 
 9
 We agree with the district court that "the messages regulated by section 17508.5 possess the three characteristics recognized by the Court as constitutive of commercial speech" in Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). Lungren, 809 F.Supp. at 754. In Bolger, the Court struck down a federal statute prohibiting the mailing of unsolicited advertisements for contraceptives under the First Amendment. In doing so, the Court set out three characteristics which, in combination, supported its conclusion that the informational pamphlets at issue constituted commercial speech, including (i) their advertising format, (ii) their reference to a specific product, and (iii) the underlying economic motive of the speaker. Bolger, 463 U.S. at 67, 103 S.Ct. at 2880.
 
 
 10
 Here, the district court reasonably found all three of these factors present. Judge Patel observed:
 
 
 11
 First, by its explicit terms, the statute regulates representations concerning a specific consumer good which take the form of advertisements or product labels. Second, section 17508.5 specifically requires that the representation be made about a specific consumer good which a firm manufactures or distributes. Third, there is little doubt that by touting the environmental benefits of consumer products, plaintiffs' association members hope to capture a portion of the "green market".
 
 
 12
 Lungren, 809 F.Supp. at 754.
 
 
 13
 Accordingly, the district court correctly settled on the "more relaxed inquiry" applicable to restrictions on commercial speech. Id. at 751, citing Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989). Under this intermediate scrutiny, the asserted governmental interest must be "substantial", rather than "compelling", and the regulation adopted must "directly advance" this interest, rather than be "precisely drawn". See Central Hudson Gas v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980); Consolidated Edison Co. v. Public Service Comm'n of N.Y., 447 U.S. 530, 540, 100 S.Ct. 2326, 2334-35, 65 L.Ed.2d 319 (1980).
 
 
 14
 We are not persuaded that the district court "basically redrafted the statutory language" in order to avoid strict scrutiny. In the Trade Associations' view, section 17508.5 applies on its face to any " 'representation' about certain environmental characteristics of consumer goods made by any 'person' who manufactures or distributes those goods." In support of this interpretation, the Trade Associations first point to the statute's supposed title, "environmental representations relating to consumer goods." Insofar as this "title" was added by the editors of West's Publishing Co., it affords scant insight into the statute's intended ambit.
 
 
 15
 The Trade Associations also object that, in the absence of exemptions for statements "designed to inform and persuade the public", a manufacturer or distributor could conceivably fall afoul of section 17508.5 by using a non-conforming definition of one of the statutorily defined terms to make a political, editorial or otherwise non-commercial representation. This possibility, they contend, exposes them to the hazards of "content or viewpoint censorship," chills privileged speech and renders the statute unconstitutional.
 
 
 16
 However, the Trade Associations fail to raise any compelling actual or hypothetical examples of non-commercial representations that, in offending the statute, would compel a finding of its unconstitutionality or at least trigger strict scrutiny. As the district court observed:
 
 
 17
 [S]ince the statute only applies to representations that a specific consumer good possesses a particular environmental attribute, plaintiffs' examples are all unavailing. Educational advertisements which laud the benefits of tin cans in general are not representations concerning the environmental attributes of a particular consumer good, and therefore do not offend the statute. Similarly, informational advertisements that contain generalized expressions of an environmental attribute are not within the statute's ambit. Finally, a firm's statement that it supports recycling is certainly not a representation concerning a consumer good.
 
 
 18
 Lungren, 809 F.Supp. at 752.
 
 
 19
 We bear in mind that "[a] statute, of course, is to be construed, if such a construction is fairly possible, to avoid raising doubts of its constitutionality." St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981). The district court's interpretation is more than "fairly possible". As the district court observed, the preamble specifies that only representations pertaining to the speaker's own products give rise to potential liability. In addition, the district court reasonably attributed some significance to the California legislature's placement of section 17508.5 in the middle of Part 3, Chapter 1 of the code, entitled "Advertising", and, more specifically, in Article 1 of Chapter 1, entitled "False Advertising in General". In conjunction with the three Bolger factors analyzed by the district court and the limiting language in the statute's preface, the placement of section 17508.5 amidst provisions more generally governing advertising and, in particular, false advertising, betokens the statute's commercial subject matter and the California legislature's intent to regulate misrepresentations made in a commercial context exclusively.
 
 
 20
 We are also not persuaded that the Court "expressly rejected" the district court's interpretation of Bolger's guidance as to the commercial/non-commercial dichotomy in Cincinnati v. Discovery Network, Inc., --- U.S. ----, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), an opinion handed down in the interim between Judge Patel's decision and this appeal. In Cincinnati, the Court struck down a municipal ban on newsracks containing "commercial handbills" which exempted newsracks containing "newspapers" with non-commercial elements. The Court held that there was not a reasonable fit between the content-based ban and the city's legitimate interest in safety and esthetics, insofar as "respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain of Cincinnati's sidewalks." Id. at ----, 113 S.Ct. at 1514.
 
 
 21
 While Cincinnati devotes considerable attention to the uncertain contours of commercial speech and its least privileged "core", --- U.S. at ---- - ----, 113 S.Ct. at 1511-13, it does not abolish the commercial/non-commercial speech distinction or the three-part test enunciated in Bolger and applied by the district court. See Outdoor Systems, Inc. v. City of Mesa, 997 F.2d 604, 610 (9th Cir.1993) (concluding in light of Edenfield v. Fane, --- U.S. ----, ----, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993) that the "commercial-noncommercial analytical distinction still exists"). Rather than adapt or abandon the distinction between commercial and non-commercial speech, the Court in Cincinnati merely reiterated that allegedly core commercial speech must be " 'examined ... carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed.' " --- U.S. at ----, 113 S.Ct. at 1513, quoting Bolger, 463 U.S. at 66, 103 S.Ct. at 2880.
 
 
 22
 The district court followed this guidance in its examination of section 17805.5. It diligently parsed the statutory definitions and analyzed numerous examples of speech allegedly in danger of being chilled by the statute. Lungren, 809 F.Supp. at 754, 760-62. With the exception of the term "recyclable", deemed unduly vague, the district court satisfied itself after thorough analysis that section 17508.5 would neither stifle non-commercial expression by manufacturers and distributors nor create unconstitutionally excessive uncertainty for such merchants in their use of the regulated terms in commercial speech.
 
 
 23
 In addition, the district court correctly determined that section 17508.5 escapes strict scrutiny because it does not embrace non-commercial messages inextricably linked with commercial speech. Where commercial and non-commercial speech are inseparable, strict scrutiny is required. Fox, 492 U.S. at 477, 109 S.Ct. at 3033. Applying the Fox test for severability of commercial and non-commercial speech, the district court reasonably concluded that editorializing was not essential to product advertising. Lungren, 809 F.Supp. at 753 ("[w]hile statements that a firm supports recycling, for instance, are undoubtedly included in advertisements as a marketing tool and may in fact augment sales, firms can nevertheless sell their wares without editorializing about the environment"). Conversely, the district court persuasively reasoned that a firm can editorialize about the environment, lambast the statute or laud recycling without advertising or otherwise making commercial representations about one of its products. Id. at 754. Insofar as these activities are severable and separately treated under section 17508.5, the district court appropriately selected intermediate scrutiny.
 
 
 24
 The Trade Associations also argue that restrictions on commercial speech only become subject to intermediate scrutiny where the governmental interest they further relates directly to the distinction between commercial and non-commercial speech. Here, they contend, the "District Court has run afoul of the very holding of Cincinnati that commercial speech may not be treated differently from non-commercial speech when the distinction between the two bears no relationship to the interests that the State has asserted."
 
 
 25
 Cincinnati, involving municipal beautification efforts, is readily distinguishable from the instant case, involving protection of consumers against potentially misleading commercial speech. Citing Bolger, 463 U.S. at 81, 103 S.Ct. at 2888, the Court in Cincinnati marked the boundaries of its "narrow" ruling by noting that:
 
 
 26
 Cincinnati has not asserted an interest in preventing commercial harms by regulating the information distributed by respondent publishers' newsracks, which is, of course, the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech.
 
 
 27
 Cincinnati, --- U.S. at ----, 113 S.Ct. at 1515. The Court emphasized that, insofar as the attractiveness of a newsrack was unrelated to its contents, the city's restriction based on commercial content "bears no relationship whatsoever to the particular interests that the city has asserted." Id. at ----, 113 S.Ct. at 1514. Here, as explained further below, California has asserted an interest in preventing commercial harms, and the distinction between commercial and non-commercial speech is directly related to that interest. As the district court concluded, merchants' commercial representations about the environmental attributes of their wares are far more likely to mislead consumers than their editorial commentary opposing the statute or encouraging recycling and use of biodegradable materials.
 
 
 28
 In sum, we conclude that the district court established the basis for intermediate scrutiny by determining correctly that section 17508.5 is directed only at commercial speech and does not collaterally stifle more privileged speech.
 
 
 29
 B. Section 17508.5 withstands intermediate scrutiny.
 
 
 30
 The Trade Associations assert that section 17508.5 fails to withstand intermediate scrutiny, even assuming its applicability, because the statute prohibits truthful and accurate commercial speech, fails to advance directly any alleged government interest, and is more restrictive than necessary to serve its supposed interests. We disagree.
 
 
 31
 The constitutionality of a statute is a question of law reviewed de novo. Actmedia, Inc. v. Stroh, 830 F.2d 957, 962 (9th Cir.1986).
 
 
 32
 1. Section 17508.5 restricts potentially misleading speech.
 
 
 33
 Central Hudson enunciated a four-part test for gauging the constitutionality of a statute subject to intermediate scrutiny. The first part of the Central Hudson test requires a determination of whether the speech in question "is protected by the First Amendment. For commercial speech to come within that provision, it must at least concern lawful activity and not be misleading." 447 U.S. at 566, 100 S.Ct. at 2351. Establishing a benchmark for the application of this factor, the Court in Central Hudson postulated that "[t]he government may ban commercial messages which are more likely to deceive the public than to inform it." Id. at 563, 100 S.Ct. at 2350.
 
 
 34
 The district court held that "the environmental advertisements in question are at least potentially misleading to the public and therefore some form of regulation is justified." Lungren, 809 F.Supp. at 756. In doing so, it rejected the CAW's position that the commercial speech at issue "is inherently misleading and therefore not protected by the First Amendment at all." Id. at 755, n. 7.
 
 
 35
 This ruling was correct. The following four factors govern whether commercial speech enjoys the protection of the First Amendment: (i) whether the speech restricted is devoid of "intrinsic meaning", Friedman v. Rogers, 440 U.S. 1, 12, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1978); (ii) the "possibilities for deception", id. at 13; (iii) whether "experience has proved that in fact such advertising is subject to abuse," In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982); (iv) the "ability of the intended audience to evaluate the claims made." Id.
 
 
 36
 Whether the terms regulated by section 17508.5 are misleading or informative as used in representations about consumer products depends in large part on the proximity of recycling facilities, the composting techniques of local landfills, and other circumstantial factors objectively ascertainable, with some difficulty, by the consumer. In locales where consumers have access to facilities and technologies favoring recycling and speedy decomposition, the terms subject to section 17508.5 may accurately inform the consumer that the product is environmentally sound in some measure. In the less favorable circumstances prevailing in many areas of California, use of the same terms could well be misleading. Depending on these contingencies, use of the regulated terms may or may not be deceptive, and is accordingly only "potentially misleading".
 
 
 37
 Contrary to the CAW's assertions, Friedman does not undermine this conclusion. In Friedman, the Court upheld a complete ban on optometrists' use of trade names in practising their profession as furthering a substantial state interest in preventing deception of consumers. The Court underscored that "[h]ere, we are concerned with a form of commercial speech that has no intrinsic meaning" and only "ill-defined associations ... with price and quality." Friedman, 440 U.S. at 12-13, 99 S.Ct. at 895-96. In contrast, the terms regulated by section 17508.5 may be imprecise, but they are not altogether fanciful or inherently uninformative. "Recycled", for example, conveys at least a modicum of information informing the consumer that the product consists in some measure of reused resources, even if the source of recapture may be uncertain. In contrast, the trade names at issue in Friedman consisted largely of more fleeting or at least subjective associations rather than anything resembling "intrinsic" meaning for purposes of the first factor of the test enunciated in that case for determining whether commercial speech merits First Amendment protection.
 
 
 38
 As discussed more fully below, we find further support for affording limited protection to the speech regulated by section 17508.5 in the remaining three factors governing this inquiry, focusing on its potential for deception in light of the lessons of experience and the nature of the target audience. Accordingly, we deem the statute to comport with the first part of the Central Hudson test.
 
 
 39
 2. California's interests in environmental and consumer protection are undisputed.
 
 
 40
 The parties agreed that California had a substantial governmental interest in ensuring truthful environmental advertising and encouraging recycling. Therefore, the district court properly concluded that "[t]he second part of the Central Hudson inquiry requires no discussion." Lungren, 809 F.Supp. at 756.
 
 
 41
 3. Section 17508.5 directly advances undisputed governmental interests.
 
 
 42
 As to the third part of the Central Hudson test, the district court correctly noted that the fit between the governmental interest and the legislative means chosen to promote it "need not be perfect, but simply reasonable." Id. at 757, citing Metromedia, Inc. v. San Diego, 453 U.S. 490, 509, 101 S.Ct. 2882, 2893, 69 L.Ed.2d 800 (1981) (plurality). Put somewhat differently, the First Amendment and the third prong of Central Hudson require only that, in the commercial context, the speech-restrictive means chosen provide more than "ineffective or remote support" for a legitimate governmental policy goal. Central Hudson, 447 U.S. at 564, 100 S.Ct. at 2689.
 
 
 43
 Applying this test, the district court found that section 17508.5 "directly advances the asserted governmental interest." Lungren, 809 F.Supp. at 757. In reaching this conclusion, the district court deemed reasonable "the California legislature's belief that uniform standards for frequently used environmental advertising terms would promote the state's consumer protection goals." Id.
 
 
 44
 To establish the requisite nexus between the governmental interest asserted and the measure adopted, California need not resort to a chain of complex, untested and tenuous assumptions about "conditional and remote eventualities". See Central Hudson, 447 U.S. at 569, 100 S.Ct. at 2353 (deeming asserted governmental interest in equitable distribution of the costs of sub-optimal electricity consumption too tenuous to support regulation prohibiting utility company from inserting handbills promoting off-peak consumption in billing statements). California seeks to guard against a direct, predictable and ongoing result of green marketing--increased sales of goods as a result of potentially specious claims or ecological puffery about products with minimal environmental attributes. This supposition is sufficiently reasonable and substantiated to support the district court's finding of an adequate fit under the third prong of the Central Hudson test. As the district court noted:
 
 
 45
 In holding that Puerto Rico's ban on advertising casino gambling directly advanced the government's interest in reducing the demand for gambling, the Posadas Court looked no further than the reasonableness of the legislature's belief that advertising casino gambling increases the demand for gambling.
 
 
 46
 Lungren, 809 F.Supp. at 757, citing Posadas v. Tourism Co. of Puerto Rico, 478 U.S. 328, 342, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986).
 
 
 47
 Here, as in Posadas, the nexus between advertising, consumer demand and the asserted governmental interests is sufficiently close. Although comprehensive economic data are lacking, the record contains abundant support for the proposition that green marketing boosts consumer demand for the allegedly recycled or biodegradable product. See Lungren, 809 F.Supp. at 755. Appellees and amici have cited numerous instances of advertisers making marketing claims containing misleading or inconsistent uses of the terms regulated by section 17508.5. See Stephen Gardner, How Green Were My Values: Regulation of Environmental Marketing Claims, 23 Univ.Toledo L.Rev. 31 (1991). Finally, the record indicated that most consumers who purchase environmentally-oriented products discovered their alleged ecological attributes from packaging labels. In short, we find sound support for the California legislature's conclusion that ecological claims boost consumer demand for products that do not always measure up. Given this nexus between commercial representations and consumption, the standardization of terms used in commercial representations about a product's environmental attributes is directly related to California's undisputedly substantial interests in truthful environmental advertising and conservation.[2]
 
 
 48
 a. The consumer protection interest.
 
 
 49
 Section 17508.5 increases certainty in the market both on the demand and the supply side. The statute increases consumer knowledge and awareness and discourages exploitation and deception of the growing green market identified by the Task Force. Section 17508.5 prevents the unscrupulous advertiser from capturing the green premium that ecologically-minded consumers are increasingly willing to pay for goods whose environmental bona fides they are ill-equipped to assess. To be sure, the statute does not require labels sufficiently specific to distinguish the most ecologically sound products from those whose "green" pedigree is less pure but statutorily adequate. Nevertheless, the ten-percent threshold for "recycled" content claims and one-year maximum period for "biodegradable" and "photodegradable" claims, for example, at least permit the ecologically-minded consumer to steer clear of products whose environmental attributes are de minimis. The statute thus sets forth "objective and consistently applied standards" of the sort whose existence has led the Court to overturn categorical bans on speech in order to prevent deception of the public. See, e.g., Peel v. Attorney Registration and Disciplinary Commission of Illinois, 496 U.S. 91, 109, 110 S.Ct. 2281, 2292, 110 L.Ed.2d 83 (1990) (striking down regulation prohibiting references even to legitimate certification credentials on attorney's letterhead).
 
 
 50
 More generally, these provisions give all consumers information permitting them to make rational product comparisons and tradeoffs in price versus "greenness". While less ecologically-oriented consumers may continue to choose brands not qualifying for eco-labelling under section 17508.5, this choice will at least become a more deliberate and informed one based on more accurate and transparent claims. Accordingly, section 17508.5 increases the flow and purity of information in the marketplace. See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 771-72, 96 S.Ct. 1817, 1830-31, 48 L.Ed.2d 346 (1976) ("[t]he First Amendment ... does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely").
 
 
 51
 In addition, the statute acts as a surrogate for monitoring functions which consumers cannot easily or comprehensively perform. In serving this function, section 17508.5 is not infused with the sort of paternalism decried by the Trade Associations and by the Court in Peel, 496 U.S. at 105, 110 S.Ct. at 2290 (rejecting the "paternalistic assumption that the recipients of petitioner's letterhead are no more discriminating than the audience for children's television"). Whether a consumer protection measure is unduly paternalistic cannot be gauged without consideration of the cogency and character of the regulated class, Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 465-66, 98 S.Ct. 1912, 1923-24, 56 L.Ed.2d 444 (1978), Peel, 496 U.S. at 109, 110 S.Ct. at 2292, the transparency of the claims, their volume and the attendant burden on consumers of monitoring them, see Shapero v. Kentucky Bar Ass'n, 486 U.S. 466, 477, 108 S.Ct. 1916, 1923-24, 100 L.Ed.2d 475 (1988), and the capacities and resources of the target audience to discriminate between truthful and specious claims. See Peel, 496 U.S. at 108, 110 S.Ct. at 2291-92; American Home Products, Corp. v. F.T.C., 695 F.2d 681, 698 (3rd Cir.1982) (taking into account "difficulty for the average consumer to evaluate ... claims through personal experience").
 
 
 52
 One is confronted at every turn with evidence of the persuasive power and pervasive role of consumer product advertising in our daily commerce. For the individual consumer, the purchase of a consumer good, in contrast to the choice of a lawyer at issue in Peel, is a routine event. As such, monitoring far more frequently encountered labelling and advertising claims about such products is proportionally far more onerous. In addition, while the majority in Peel rejected Justice O'Connor's dissenting view that "the public will believe that all certifications are state sanctioned," Peel, 496 U.S. at 105, n. 13, 110 S.Ct. at 2290, n. 13, here such a belief may more readily be presumed given the broad and widely publicized role of government in regulating the written content of food labels and other consumer product packaging. See, e.g., Nutrition Labeling and Education Act of 1990, Pub.L. No. 101-535, 104 Stat. 2353 (1990).[3]
 
 
 53
 On the supply side, section 17508.5 is also favorable to scrupulous firms and merchants. In particular, the statute benefits firms whose products are not 100% environmentally friendly but nevertheless meet the minimum thresholds. It does so by delineating with bright lines a potential safe harbor in which such firms might truthfully represent their products to be "recycled" or "biodegradable" while establishing a good faith defense against prosecution under more general statutes aimed at preventing consumer fraud, including the prohibitions on false advertising set forth in sections 17500 and 17508 of the California Business and Professional Code. In turn, section 17508.5 may again create benefits for consumers in the form of reduced prices reflecting the lower insurance premiums and legal costs that manufacturers are likely to enjoy in the more certain regulatory environment fostered by the statute. See Carnival Cruise Lines v. Shute, 499 U.S. 585, 594, 111 S.Ct. 1522, 1527, 113 L.Ed.2d 622 (1991) (upholding forum selection clause in cruise line's form ticket in part because passengers who purchase such tickets "benefit in the form of reduced fares reflecting the savings that the cruise line enjoys by limiting the fora in which it may be sued").
 
 
 54
 In addition, the statute shields ecologically-oriented firms from unfair price competition. Rivals will no longer be able to negate such firms' green marketing edge by representing as "recycled" products consisting of dross recaptured from the factory floor rather than--in keeping with the more common understanding of the term--a significant (i.e., ten percent or more) portion of costlier reprocessed post-consumer waste. Section 17508.5 thus directly discourages free riding by environmentally-disinclined firms on ecological gains funded by consumers in the form of higher prices paid for "green" goods, and by other firms in the form of higher production costs unlikely to be recouped in a market of unregulated claims by lower-cost competitors.
 
 
 55
 b. The environmental protection interest.
 
 
 56
 In setting rather modest minimum targets for the recycled content and decomposition periods of consumer products, the statute creates an incentive for manufacturers of noncomplying products to enhance the environmental attributes of their goods in order to capture the benefits of green labelling. This incentive directly furthers California's substantial interest in promoting resource conservation and reducing the burden on its brimming landfills. If producers of ecologically substandard products achieve the statute's minimum thresholds, these improvements translate directly into less waste being dumped and dumped waste decomposing more rapidly. If such producers fail to adapt, a considerable number of ecologically-oriented consumers may reasonably be expected to shift in substantial measure to the products of complying firms and thereby effect the same result, additional landfill capacity and resource conservation, provided consumers can distinguish relatively green products, as section 17508.5 permits. Accordingly, section 17508.5 accords with the third prong of the Central Hudson test.
 
 
 57
 4. No far less restrictive alternatives to section 17508.5 exist.
 
 
 58
 Literally read, the fourth prong of the Central Hudson test requires that a restriction on commercial speech be "no more extensive than necessary to further the state's interest." 447 U.S. at 569-70, 100 S.Ct. at 2353. However, as noted by the district court, the Court recently explained that this test, contrary to its literal formulation, " 'requires something short of a least-restrictive-means standard.' " Lungren, 809 F.Supp. at 757, quoting Fox, 492 U.S. at 477, 109 S.Ct. at 3033.
 
 
 59
 In Fox the Court ruled that the Second Circuit erred in requiring the district court to apply a least-restrictive-means test to a state university's regulation banning private commercial enterprises from its facilities. While the Court in Fox instructed that a narrowly tailored regulation on less privileged commercial speech would logically pass muster, it also indicated that an even more flexible standard governs such "hardy, less likely to be chilled" expression. Fox, 492 U.S. at 481, 109 S.Ct. at 3035. The Court observed that "almost all of the restrictions disallowed under Central Hudson 's fourth prong have been substantially excessive, disregarding 'far less restrictive and more precise means.' " Id. at 479, 109 S.Ct. at 3034, quoting Shapero v. Kentucky Bar Ass'n, 486 U.S. 466, 476, 108 S.Ct. 1916, 1923, 100 L.Ed.2d 475 (1988). This interpretation, coupled with the Court's unwillingness to designate "narrow tailoring" as more than an upper bound for the test governing commercial speech, suggests that the First Amendment and Central Hudson 's fourth prong permit a more deferential "far-less-restrictive means test" for commercial speech.
 
 
 60
 The Trade Associations do not dispute this interpretation of Fox. However, applying this "far-less-restrictive means test", they contend that section 17508.5 is unconstitutional because the statute's alleged "blunderbuss approach sweeps so far beyond what could possibly be deemed false and deceptive that it cannot possibly provide a reasonable fit with the State's interests." We disagree.
 
 
 61
 The Trade Associations offer two purportedly far less restrictive alternatives: case-by-case prosecution of spurious environmental claims under existing false advertising statutes or adoption of a statute or regulations mandating qualifying or explanatory language to clarify use of the regulated terms not conforming with section 17508.5. The possibility of a case-by-case approach under existing statutes governing false advertising, previously opposed but newly advocated by the Trade Associations, does not undermine section 17508.5 under the fourth prong as explicated in Fox. The district court rejected this alternative on the basis that "nothing prevents a legislative body from adopting a specific law simply because a more general law already exists." Lungren, 809 F.Supp. at 758-59.
 
 
 62
 More tellingly, Fox does not permit a restriction according with Central Hudson 's first three prongs to be struck down in the absence of a "far less restrictive and more precise means." Fox, 492 U.S. at 479, 109 S.Ct. at 3034, quoting Shapero, 486 U.S. at 476, 108 S.Ct. at 1923 (emphasis added). The prohibitions of false advertising in sections 17500 and 17508 of the Business and Professional Code require reference to vague, unspecified standards (e.g., "untrue and misleading", Section 17500; "false or misleading", Section 17508) as opposed to section 17508.5's numerically exact thresholds, to ascertain liability. These alternative statutes are less precise and, as the district court noted, potentially more inhibiting of truthful environmental representations. Lungren, 809 F.Supp. at 759. Moreover, these statutes promote a narrower range of state interests than section 17508.5, insofar as they fail to create the same incentives for environmentally substandard firms to improve the ecological attributes of their products rather than merely harmonize their claims with production and disposal realities. Accordingly, Central Hudson and Fox do not dictate that the California legislature repeal section 17508.5 in favor of the pre-1990 statutory status quo.
 
 
 63
 The second suggested alternative, a statute requiring "more speech", runs headlong into the Court's rejection of such an approach to fourth prong analysis in Fox, 492 U.S. at 479, 109 S.Ct. at 3034. As Justice Scalia observed for the majority in Fox,
 
 
 64
 In Posadas, for example, where we sustained Puerto Rico's blanket ban on promotional advertising of casino gambling to Puerto Rican residents, we did not first satisfy ourselves that the governmental goal of deterring casino gambling could not adequately have been served (as the appellant contended) 'not by suppressing commercial speech that might encourage such gambling, but by promulgating additional speech designed to discourage it.'
 
 
 65
 Id., quoting Posadas, 478 U.S. at 344, 106 S.Ct. at 2978 (emphasis in original).
 
 
 66
 Here, as discussed above, the linkage between the asserted governmental interest and advertising was equally close, and the restriction less sweeping than that sustained by the Court in Posadas. Here, an alternative approach requiring additional speech to illuminate environmental claims was equally close at hand. Yet as the district court observed, these and other potential alternatives--including prescreening, format and content guidelines and added detail--were not clearly less burdensome than adherence to uniform definitions. Lungren, 809 F.Supp. at 759. In addition, as we concluded with regard to Cal.Bus. & Prof.C. Secs. 17500 and 17508, it is not apparent that use of the regulated terms with qualifiers would advance California's second asserted interest, environmental protection.
 
 
 67
 More importantly, the district court need not make finely calibrated determinations of this sort where the alternatives are closely balanced. Fox and Posadas support the district court's conclusion that in the commercial context, "the Supreme Court has specifically rejected the notion that the court should second guess a legislative decision to restrict speech rather than to require more speech." Id. (citation omitted).
 
 
 68
 To be sure, there is inevitably a degree of arbitrariness in the legislative determination of where along the continuum of recycled content percentages or decomposition timetables a product becomes "recycled" or "biodegradable". But Fox and Posadas leave scant judicial latitude to disturb such legislative determinations where, as here, the thresholds drawn do not appear unduly prohibitive and leave considerable room for both more privileged editorial commentary and, in the commercial context, alternative expressions conveying perfectly well information about the modest environmental attributes of products not measuring up under section 17508.5 (e.g., "this product contains x% [reused/recaptured ]aterials," in lieu of "recycled"; "these trash bags will decompose in two years under x conditions," in lieu of "biodegradable"). See Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (intermediate scrutiny requires that restrictions on speech " 'leave open ample alternative channels for communication of the information' ") (citation omitted). Accordingly, we affirm the district court's ruling that "the California legislature has stayed within constitutional parameters in restricting commercial expression," Lungren, 809 F.Supp. at 759.
 
 III. CONCLUSION
 
 69
 The district court correctly determined that intermediate scrutiny governs section 17508.5. Its conclusion that the statute passes muster under intermediate scrutiny is AFFIRMED.
 
 APPENDIX
 
 70
 Sec. 17508.5. It is unlawful for any person to represent that any consumer good which it manufactures or distributes is "ozone friendly," or any like term which connotes that stratospheric ozone is not being depleted, "biodegradable," "photodegradable," "recyclable," or "recycled" unless that consumer good meets the definitions contained in this section, or meets definitions established in trade rules adopted by the Federal Trade Commission. For the purposes of this section, the following words have the following meanings:
 
 
 71
 (a) "Ozone friendly," or any like term which connotes that stratospheric ozone is not being depleted, means that any chemical or material released into the environment as a result of the use or production of a product, will not migrate to the stratosphere and cause unnatural and accelerated deterioration of the ozone.
 
 
 72
 (b) "Biodegradable" means that a material has the proven capability to decompose in the most common environment where the material is disposed within one year through natural biological processes into nontoxic carbonaceous soil, water or carbon dioxide.
 
 
 73
 (c) "Photodegradable" means that a material has the proven capability to decompose in the most common environment where the material is disposed within one year through physical processes, such as exposure to heat and light, into nontoxic carbonaceous soil, water, or carbon dioxide.
 
 
 74
 (d) "Recyclable" means that an article can be conveniently recycled, as defined in Section 40180 of the Public Resources Code, in every county in California with a population over 300,000 persons. For the purposes of this subdivision, "conveniently recycled" shall not mean that a consumer good may be recycled in a convenience zone as defined in Section 14909.4 of the Public Resources Code.
 
 
 75
 (e) "Recycled" means that an article's contents contain at least 10 percent, by weight, postconsumer material, as defined in subdivision (b) of Section 12200 of the Public Contract Code.
 
 
 76
 (f) "Consumer good" means any article which is used or bought for use primarily for personal, family, or household purposes.
 
 
 77
 (g) For the purposes of this section, a wholesaler or retailer who does not initiate a representation by advertising or by placing the representation on a package shall not be deemed to have made the representation.
 
 NOONAN, Circuit Judge, dissenting:
 
 78
 I accept the majority's conclusion that the speech made criminal by this statute is commercial speech. I follow the doctrine of the Supreme Court that commercial speech is, ordinarily, more subject to state regulation than noncommercial speech. I have no doubt at all that untrue or deceptive advertising can be outlawed. I see no problem in the government prescribing precise labels for what cures our bodies or goes into them, or goes into a gas tank. But I have great difficulty in seeing this statute as anything other than a zealous and unconstitutional intrusion by a state government into an area where technologies are developing, the free play of ideas is important, and the free speech of everyone, including manufacturers and distributors, is essential to the development of a healthy environment. Tested by our Bill of Rights, the statute is defective.
 
 
 79
 To begin with, several of the definitions imposed on manufacturers and distributors under criminal penalties are unconstitutionally vague. Three definitions have a common deficiency: the use of nature as an intelligible standard in an environment and economy where there is scarcely any "nature" independent of human intervention. "Ozone-friendly" and "any like term" (a bit of extra vagueness) are defined as a chemical or material that "will not migrate to the stratosphere and cause unnatural and accelerated deterioration of the ozone." California Bus. and Prof.Code Sec. 17508.5(a). What is unnatural deterioration of the ozone? How is unnaturalness to be determined? What state of the universe is assumed to be the natural state as far as ozone is concerned? The statute affords no guidance. It compels the advertiser to determine at the peril of criminal penalties that the product advertised does not have this elusive metaphysical quality.
 
 
 80
 Less obviously, because "natural" may seem less problematic than "unnatural," but just as effectively, the statutory definitions of biodegradable and photodegradable are vague in their use of nature as the standard for the products advertised. To be biodegradable under the criminal law of California the product must be decomposable through "natural processes." What is a "natural process"? Is it one in which there is no human intervention? Is the implicit assumption of the statute that nature is one thing and human activity another, so that if human intelligence intervenes the process is no longer natural? The same questions are latent in the definition of photodegradable in terms of ability to decompose by "physical processes, such as exposure to heat and light," where "physical" is a stand-in for "natural." The advertiser is left to speculate what degree of human intervention will sully the natural and so lead to noncompliance with the statutory command.
 
 
 81
 As for "recyclable" and "recycled", what is recyclable should eventually be recycled. One would expect the definition of the two terms to be in tandem. The statute, however, adopts one definition of "recyclable" and another of "recycled", so that what is "recyclable" will not necessarily be "recycled" when re-use is made. "Recyclable" has now been held to be defined in a fashion incomprehensible to a manufacturer or distributor of ordinary intelligence. Does striking it from the statute make "recycled" more intelligible by removing the statute's inconsistency? Arguably, yes, although a lingering doubt remains about the surviving definition which in its origin was so flawed.
 
 
 82
 There is an additional flaw. "Recycled" is not completely defined by the statute at issue but by cross-reference to the Public Contract Code Sec. 12200(b). The difficulty with this definition is as follows: For the regulation of commercial speech to be sustainable under the First Amendment there must be at least a reasonable fit between the statute and the state's goal. United States v. Edge Broadcasting Co., --- U.S. ----, ----, 113 S.Ct. 2696, 2703-05, 125 L.Ed.2d 345 (1993). The Public Contract Code's definition of "postconsumer waste" takes no account of the differences among the principal materials subject to recycling--glass, metal, paper, and plastic--nor the different technologies by which recycling of these materials may be accomplished. As the Environmental Protection Agency has observed: "it is not clear that a commonly accepted, sound basis exists setting content percentages across many products." EPA, Request for Comments; Guidance for Use of the Term 'Recycled' and 'Recyclable' and the Recycling Emblem in Environmental Marketing Claims, 56 Fed.Reg. 49,992, 49,996 (1991). In the statutory definition of recycled, the vagueness inheres not in the definition but in the fit between the definition and the state's interest. At best it is a speculation that there is any connection between protection of the environment, encouragement of environmentally sensitive advertisers, and protection of environmentally conscious consumers and the blunderbuss definition of "postconsumer waste" which serves as a crude guide in public purchasing.
 
 
 83
 The statute has other constitutional infirmities. The district court noted that to avoid the reach of the First Amendment the words that the statute defined must be "sufficiently deceptive." As to whether the words were in fact "sufficiently deceptive," the district court candidly acknowledged that it found "no easy answer." The strongest thing the district court could say about the restricted words was that, without the state's help, they were "potentially misleading." To substantiate that characterization the district court cited a letter from the attorney general's office to the governor which "opined" that there had been "an increase" in "questionable 'environmental' advertising." No actual instances of deception were cited; the letter was written as advocacy for enactment of the statute. The district court also cited a letter from the sponsor of the legislation to the governor. This letter did indeed give two examples, one involving the use of "biodegradable," the other of "recyclable." The second example, however, led nowhere, because the district court removed "recyclable" from the statute; so that only one instance of one word, cited by a partisan of the statute and unproved in court, is the factual basis for the conclusion that all four words are potentially misleading. The true basis for this far-reaching conclusion, on which the majority opinion so heavily relies, is speculation. Speculation is no basis on which to support a criminal law licensing speech. Edenfield v. Fane, --- U.S. ----, ----, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993).
 
 
 84
 Even if, contrary to the record in this case, the presumption were indulged that a factual predicate of potential deceptiveness had been established, such facts would not justify the state's invasion of freedom of speech. A variety of words are commonly used in American advertising, all of which are potentially misleading. For example:
 
 
 85
 antique
 
 
 86
 bargain
 
 
 87
 economical
 
 
 88
 environmentally sound
 
 
 89
 naturally good
 
 
 90
 A paternalistic government might decide to protect consumers by criminalizing all advertising containing these words if the product advertised failed to conform with the state's own definition. That the terms defined were capable of misleading use would be incontestable. That a criminal law of this character would violate the First Amendment would be equally incontestable. Potential misuse "does not satisfy the State's heavy burden of justifying a categorical prohibition against the dissemination of accurate factual information." Peel v. Attorney Registration and Disciplinary Commission, 496 U.S. 91, 109, 110 S.Ct. 2281, 2292, 110 L.Ed.2d 83 (1990). The difference between this hypothetical statute and the California criminal law at issue here is not a difference in kind or in degree. The only difference is that the California law has chosen a different set of speculatively misleading words to define and criminalize.
 
 
 91
 Why have these particular words been made the subject of legislation? Why have Californians Against Waste and the Environmental Defense Fund been allowed to enter the case on the side of the state with the status of intervenors? Why do these intervenors defend the district court's decision with such skill, tenacity and vigor? Plainly because, as the intervenors declare, the words defined are "key environmental terms". In the Green Movement the words are powerful, evocative, almost sacred. There is a sense that they should not be profaned by casual usage. The legislation embodies a clear conviction that there are those who can be trusted to use them and those who cannot be trusted; for the legislation singles out commercial advertisers as the untrustworthy and leaves unregulated and trusted the nonprofits who believe the terms are key.
 
 
 92
 Such a distinction between speakers, made by a legislature, has a name: viewpoint discrimination. Such a distinction has a constitutional destiny, to be held a violation of the First Amendment unless, strictly scrutinized, it is shown to be narrowly tailored to serve a compelling state interest. R.A.V. v. City of St. Paul, --- U.S. ----, ----, 112 S.Ct. 2538, 2547, 120 L.Ed.2d 305 (1992). A legislature cannot privilege one set of speakers as the good guys, while restraining another set of speakers as the baddies. When the speakers use the same language, it's not difference enough that one speaks for profit and the other for "nature."
 
 
 93
 This broad-brush, speculatively-justified statute cannot survive the test of rationality, let alone strict scrutiny. To the state's present embarrassment, the state argued in its Points and Authorities to the district court that the plaintiffs would not violate the statute if their advertising qualified the restricted terms appropriately. This argument, of course, rewrote the statute, was ignored by the district court, and is abandoned by the state on this appeal. But the abandoned argument does point to the obvious, that with a minimum of effort the legislature could have provided that qualified use of the terms was acceptable. The legislature tacitly conceded as much by accepting in the statute itself any definitions "established in trade rules adopted by the Federal Trade Commission." If potential misuse was the problem, it would have been possible to do as the FTC may sometime do and as Maine in fact does do, provide a governmental definition of "recycled content," but permit any "properly qualified statement of fact" addressed to consumers. Maine Rev.Stat.Ann., Title 38, Sec. 2141.2. When such means could be used to attain the legislative end, the present fit is too rough to be rational.
 
 
 94
 In summary, the statute in question, criminalizing the use of specific words in commercial speech, is vague in the standard set; has a rough and speculative relation to the interests of the state; and discriminates among speakers. The statute is incompatible with the freedom assured by the First Amendment.
 
 
 
 *
 Briefs of amici curiae urging reversal were filed in support of the plaintiffs-appellants by the Washington Legal Foundation and by the Media Institute in conjunction with Capital Cities/ABC, Inc., Dow Jones & Company, Inc., Fox, Inc., the National Association of Broadcasters and Providence Journal Company
 Briefs of amici curiae urging affirmance were filed in support of the defendant-appellee by the California Resource Recovery Association, Washington Citizens for Recycling, the National Resources Defense Council, Solana Recyclers, San Diego Recycling Company, Weisco Recycling, Envirothene Plastics, Inc., Talco Plastics, Wellman Inc., and Enviroplastics; the Center for Science in the Public Interest and Public Voice for Food and Health Policy; and the States of Minnesota, Tennessee, Connecticut, Massachusetts, Texas and Washington.
 
 
 **
 The Honorable Alfredo C. Marquez, Senior United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 In addition, the district court accepted the Trade Associations' contention that the statute's definition of "recyclable" was unconstitutionally vague, but otherwise rejected their challenge of section 17508.5 for vagueness. This ruling has not been appealed
 
 
 [2]
 In its analysis of Central Hudson 's third prong, the district court only analyzed the fit between section 17508.5 and California's interest in ensuring truthful environmental packaging and advertising. However, California's interest in recycling--discussed by the district court in its analysis of the now essentially similar fourth prong--was likewise undisputed and further supports the district court's ruling under the third prong
 
 
 [3]
 As amici Center for Science in the Public Interest and Public Voice for Food and Health Policy point out, regulations on deceptive advertising and labelling of foods and drugs have repeatedly been upheld against First Amendment challenges. See, e.g., Kraft, Inc. v. F.T.C., 970 F.2d 311, 324-26 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1254, 122 L.Ed.2d 652 (1993) (upholding Federal Trade Commission (FTC) ban on deceptive claims about the calcium content of processed cheese products); Bristol-Myers Co. v. F.T.C., 738 F.2d 554, 562 (2d Cir.1984), cert. denied, 469 U.S. 1189, 105 S.Ct. 960, 83 L.Ed.2d 966 (1985) (upholding FTC prohibitions on certain types of advertising claims about analgesics); United States v. General Nutrition, Inc., 638 F.Supp. 556, 562 (W.D.N.Y.1986) (upholding Food and Drug Administration's prohibition on certain types of nutritional claims on product labels)